**UNITED STATES of America, Plaintiff,**

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant.**

No. 80 C 5124.

United States District Court, N.D. Illinois, E.D.

July 16, 1986.

---

Neil H. Koslowe, Sp. Litigation Counsel, Civil Div., Dept. of Justice, Washington, D.C., for plaintiff.

Robert C. Howard, Robert M. Weissbourd and James Bradtke, Hartunian, Futterman & Howard, Chtd., and Hugh R. McCombs, Jr., David Narefsky and Denise L. Jarrard, Isham, Lincoln & Beale, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Before the Court is the Board of Education's motion to compel the United States to provide interim funding of the Board's Desegregation Plan pending appeal, under paragraph 12 of the Court's December 23, 1985 Remedial Order. Specifically, the Board seeks release of certain funds in the Discretionary Fund account and the Bilingual Education account. For the reasons that follow, the Board's motion is granted in part and denied in part.

The parties are well aware that the Court has strongly favored private resolution of the disputes, and we appreciate that they have resolved most of the interim funding dispute themselves. The Consent Decree called for the parties to work side-by-side in creating, implementing and funding the Desegregation Plan, but the history of the case has seen more battles than cooperation. We hope that the recent cooperation signals a return to the original spirit of the Consent Decree, and that the parties will henceforth spend more time on desegregation than litigation. Unfortunately, not every dispute has been resolved; specifically, the parties feel their differences over the Discretionary and Bilingual funds [1] are irreconcilable. The level of mutual distrust and suspicion in this case is extraordinarily high and is dropping only slowly. Had the parties' relationship not been poisoned, they probably could have settled even the issues before us, we think. In any event, the Court must now resolve this dispute.

### A. *Discretionary Fund*

The Board seeks the release of $750,000 of Discretionary Fund money to support a project it is implementing in ten

---

1. Contrary to the suggestions of the Board, we do not see any indication from the record that the United States is deliberately dragging its heels with respect to the two accounts in dispute. Nor do we blame the Board for the delay as the United States does. For what it is worth, the parties should know that from our vantage point it appears (1) that both parties have good faith and reasonable bases for the positions they have taken; and (2) that the delays have not been unreasonable, but rather have resulted from good faith but failed efforts at settlement. Having noted and summarily disposed of the parties' lengthy "accusation" sections in their briefs, we turn to the real dispute.

schools. The Board wants to fund a "modified version" of the Chicago Effective Schools Project ("CESP"). This project is described in our Findings 213–33. *See* 621 F.Supp. 1296, 1346–50 (N.D.Ill.1985). The Board proposes to use the federal money to pay for some, but not all, parts of the CESP plan in these schools. Virtually all of the money would be devoted to paying salaries of assistant principals (who would assume many of the principals' normal duties so that principals would be forced to coordinate and evaluate the CESP) and paying for field trips, which serve as "cultural enrichment" in the "open schools" that the CESP creates. The parties dispute whether the money will be spent on a "model" program, of "national significance," as required by the relevant statute, 20 U.S.C. § 3851. In particular, the United States complains that: (1) the project will not make "a contribution of national significance"; (2) it uses no "innovative techniques"; (3) it is not "self-contained" and easily replicated. It argues that the money would simply be squandered on field trips and assistant principals (performing *other* tasks), perverting the purposes of the Discretionary Fund. In response, the Board emphasizes that the CESP project *as a whole* is a model program of national significance, innovative, capable of dissemination and replication.

The parties' arguments remind one of the fabled disagreement about whether the half-filled glass is half-empty or half-full. Neither side really disagrees with what the other is saying; they are instead coming at the problem from opposite sides and talking past each other. The United States is correct that the *details* of the Board's funding proposal would hardly raise an educator's eyebrow: field trips *qua* field trips are not innovative, even if glossed with the new name "cultural enrichment activities"; similarly, the "extended day program," which involves "extra" instruction in basic skills, contemplates *more* rather than a new *kind* of instruction. But the Board is also correct, and the United States does not dispute, that the CESP, *as a whole*, is innovative and can be seen as a model. *See*

Findings 213–33, 566–67. The requested funds go a long way to making the whole project run. How, then, to resolve this disagreement as to approach?

To answer this, we return to our triad of requirements for funding projects in the Board's Plan: the project must materially further the overall success of the desegregation plan, contain reasonable costs and be consistent with statutory criteria. *See, e.g.,* March 14, 1986 Memorandum Order. The parties do not raise an issue about the first two legs of the triad. They are essentially arguing about the third leg. Turning to the statute, we see that the Board's proposal is consistent with statutory criteria. 20 U.S.C. § 3851(a) authorizes the Secretary to fund a local educational agency to "carry out ... programs and projects" which, among other things, "carry out research and demonstrations related to the purposes of this chapter," "are designed to improve the training of teachers ... needed to carry out the purposes of this chapter," and "are designed to assist [the Agency] in the implementation of programs under this chapter." § 3851(a)(2), (3), (4). Desegregation is a purpose of the chapter. The Secretary does not contend that the CESP is not a valid program under the relevant chapter. Nor does it claim that the CESP, as a whole, is not a "program or project" which falls under § 3851(a). Finally, the Secretary does not argue that the *statute* forbids funding only a *part* of this otherwise statutorily eligible project. In sum, the Board's project appears consistent with express statutory criteria; at a minimum, the statute does not appear to *forbid* funding of the Board's project, even though most of the funds will go to a few non-innovative aspects which form part of a scheme which is innovative overall.

In light of our "pipeline holding," *see, e.g.,* 621 F.Supp. 1317–22, we would be justified with ending here, without considering more than statutory criteria; however, even the regulatory criteria do not appear to forbid funding of the Board's Plan. The Secretary cites no regulation supporting his argument that the Fund can

only underwrite a "self-contained" project. We found nothing in the regulations saying this, *see* 34 C.F.R. §§ 760.1–760.41 (1985). Nor do the regulations forbid the Secretary to fund "non-innovative techniques" which are part of a project which is a nationally significant model overall. "The extent to which the project involves techniques that are innovative" is merely one, relatively minor factor for the Secretary to consider in his overall rating of a project, *see* 34 C.F.R. § 760.31(g), *not* a necessary predicate to funding, which the Secretary implies.[2]

In short, the Board's proposed project satisfies our triad of requirements, and, moreover, is not inconsistent with regulations. This is not to say the Board chose the best project on which to use the Discretionary Fund money. And, frankly, we are at a loss to explain why the Board will be paying assistant principals who will "free up" principals instead of paying the principals directly. Because this is merely a matter of accounting procedure, and not substance,[3] we do not see this as fatal under statutory criteria, but neither do we see it as a thoughtful proposal designed to assuage the Secretary's fears that the Board will spend federal dollars inappropriately.

### B. *Bilingual Funds*

The parties have resolved most of their debate over the Board's proposed bilingual projects. The Secretary now voices two major objections, one with respect to the "Developmental Bilingual Education program" and one about the "Newcomer Student Program." We consider each in turn.

■ 1. *Developmental Program.* Part of this program calls for teaching Spanish literacy, as well as history and culture, to "limited English proficiency" ("LEP") Hispanic children. The problem, according to the United States, is that English-speaking monolingual students will be part of this program, including the part involving teaching of Spanish literacy. The government contends that the relevant statute, 20 U.S.C. § 3261[4] and the regulations, 34 C.F.R. Part 520 (1985), forbid spending these federal dollars on what it calls teaching Spanish to English-speaking students.

Were the Board merely trying to teach Spanish to English-speaking students, the government would surely be correct. But that is not what the Board is doing. It appears to the Court that the program is primarily aimed at the Hispanic students; the English-speaking students are included in order to keep the entire class together, probably for both pedagogical and desegregation-related reasons. This is not inconsistent with the statute and regulations cited by the government. In fact, the statute and regulations *expressly* contemplate that *all* students will take part in the culture and history instruction. *See* 20 U.S.C. § 3261(a)(1)(A); 34 C.F.R. § 520.10 (1985). While this part of the statute does not expressly include the "English-speakers" in the Spanish literacy training, neither does it say they cannot be part of such a class, where the majority of students is Hispanic and where the literacy is aimed primarily at this majority. Indeed, although neither side cited it, the definitional section of the statute seems to expressly endorse such an arrangement. 20 U.S.C. § 3223(a)(4)(A)(i) defines a "program of bilingual education" to include instruction of "the native language [i.e., Spanish]" of LEP children "to

---

**2.** The regulations require the Secretary to assign points to various aspects of an application, with 100 being the top score. Fifteen points are devoted to "national significance," and "innovative techniques" form just one of seven or so factors to consider in the calculus. *See* 34 C.F.R. § 760.32(g) (1985). Thus, the Secretary exaggerates by suggesting that a project *must* use innovative techniques.

**3.** It makes little to no practical difference whether the money goes to the principals direct-ly or indirectly, so long as the money enables the principals to devote their time to the CESP project.

**4.** The parties agree that an earlier version of the Bilingual Act applies to this issue. Our statutory cites are to the Act which existed before 1984, which can be found in the bound version of 20 U.S.C.S. §§ 1501–5000 (Lawyers Co-Operative 1982).

the extent necessary to allow a child to achieve competence" in English. 20 U.S.C. § 3223(a)(4)(B) adds (with our emphasis):

> (B) In order to prevent the segregation of children on the basis of national origin in programs assisted under this title, and in order to broaden the understanding of children *about languages* and cultural heritages other than their own, *a program of bilingual instruction may include the participation of children whose language is English,* but in no event shall the percentage of such children exceed 40 per centum. The objective of the program shall be to assist children of limited English proficiency to improve their English language skills, and the participation of other children in the program must be for the principal purpose of contributing to the achievement of that objective.

Under this section, the Board may use bilingual funds to include English-speaking monolingual students so long as they comprise no more than 40% of the class and the program's overall purpose and design is geared toward improving the English language skills of the LEP children. The Board's program appears to satisfy these criteria, although lacking the parties' input on this issue, we hesitate to express a firm opinion. For now, we simply hold that the United States' present objections appear to lack merit;[5] we leave it to the parties to assess whether the Board's project satis-

fies the criteria of § 3223(a)(4)(B), and report to the Court if our unassisted analysis was somehow misguided. Assuming that the Board's project now satisfies (or can be amended to satisfy) this section, and that these criteria are relevant, the withheld money should be disbursed.

■ 2. *Newcomer Students.* This program was changed to include students in the ethnically diverse Uptown-Edgewater area. The problem is that Uptown is so diverse that some schools have only one or a handful of LEP students of some languages. We assume, for example, that some schools or classes might have just two or three Thai or Filipino students. The Board contends (and the Secretary does not dispute) that it would be inefficient to hire qualified personnel to teach so few students. Faced with this practical problem, and still desiring to give these students *some* bilingual instruction, the Board proposes to use bilingual student tutors, arguing in effect that mediocre instruction is better than none at all. The Secretary *properly frames the question as whether the statute allows funding such instruction,* regardless of whether the Board's proposal makes some sense.

The Secretary contends first that § 3223(a)(4)(A)(i)[6] does not permit the Board to deny native language instruction to *any* LEP child, even if only one such child is in the school. The Secretary next asserts that § 3231(b)(3)(C)(i)[7] requires the

---

5. The United States points to no specific language supporting its position. We observe also that in addition to § 3223(a)(4)(B), the statute supports the Board's project as a complement to a desegregation plan. *See* § 3261(a)(3).

6. That section reads:
(4)(A) The term "program of bilingual education" means a program of instruction, designed for children of limited English proficiency in elementary or secondary schools, in which, with respect to the years of study to which such program is applicable—
(i) there is instruction given in, and study of, English and, to the extent necessary to allow a child to achieve competence in the English language, the native language of the children of limited English proficiency, and such instruction is given with appreciation for the cultural heritage of such children, and of oth-

er children in American society, and, with respect to elementary and secondary school instruction, such instruction shall, to the extent necessary, be in all courses or subjects of study which will allow a child to progress effectively through the educational system.

7. That section reads:
(3) An application for a grant under this part may be approved only if—
   *    *    *    *    *    *
(C) the Secretary determines—
(i) that the program will use the most qualified available personnel, including only those personnel who are proficient in the language of instruction and in English, to the extent possible, and the best resources, and will substantially increase the educational opportunities for children of limited English proficiency in the area to be served by the applicant.

Board to use "the most qualified available personnel," which precludes it from using student tutors. We sympathize with the Board's lament that the Secretary's dual argument places the Board on the horns of a dilemma. The Secretary first says the Board *must* give native language instruction to *every* child, but then he does not provide extra funds for such an expensive responsibility. The Board's proposal offers a compromise: give some, less effective instruction to the children who speak unusual languages. Despite the Board's plea for common sense, we think its proposal runs afoul of the statute.

In so concluding, we rely only on the second prong of the Secretary's argument. It is not apparent to us that § 3223(a)(4)(A) requires the Board to give bilingual instruction to *every* LEP child, even one speaking Urdu. Certainly the statute does not say so explicitly, and the Secretary has not otherwise explained why its first prong is correct. But even if we disregard that argument, we agree with the Secretary that § 3231(b)(3)(C)(i) forbids the use of student tutors as the Board proposes. We do not see, and the Board does not explain, how the tutors can be the "most qualified available personnel" under this statute. Contrary to the Board's unsupported argument, the statute does seem to *require* use of such personnel: "An application for a grant under this part may be approved *only if*" the Secretary determines "that the program will use the most qualified available personnel." *See* n. 6 above. The Board does not argue that its tutors are "qualified" under this statute; rather, it just says that using such tutors is the only

realistic and practical thing it can do. That may be so, but we agree with the Secretary that the statute says otherwise in this context.

Accordingly, the Board's motion is denied to the extent it seeks funding for the Newcomer Student Program incorporating use of student tutors. The parties shall re-evaluate the Board's project in light of this ruling, hopefully reaching an agreement on a revised project.

## C. *Conclusion*

For the reasons spelled out earlier, the Board's motion to compel the United States to provide interim funding is granted with respect to the Discretionary Fund; it is granted with respect to the Developmental Bilingual Education Program, provided the Board's project satisfies § 3223(a)(4)(B); it is denied with respect to the Newcomer Student Program, until the Board revises its project to conform with the relevant statute. The parties shall prepare a draft order reflecting the results of this opinion and submit it by July 25, 1986. We will schedule no status hearing until after the appeal is decided.[8] It is so ordered.

---

**8.** We have commented earlier on the parties' bitterness toward each other, which persists to some extent despite their ability to reach some agreements. If the parties are ever to work smoothly together, some of their attitudes and assumptions must change. The United States seems ever-ready to attack a Board proposal rather than eager to work *with* the Board in designing a reasonable proposal; it presumes inadequacy, taking the attitude, "What's wrong with the Board's proposal," rather than, "How can the Board's proposal be made workable?" While the government should scrutinize the Board's proposals carefully, it should be more

flexible in its approach. In turn, the Board should move from its presumption that virtually every government criticism is illegitimate and prompted by ill-will. The Board's suspicion is well founded in the history of the case, but even the Board has admitted that the United States has been more cooperative lately. Despite its history of possible bad faith, the United States surely has legitimate concerns and has raised some legitimate criticisms. We are hopeful that the parties can put the past behind them, bury the hatchet, so to speak, especially after the Seventh Circuit issues its third, and decisive, opinion.